**UNITIED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| D. ALLEN BLANKENSHIP, | Civil Action No. 2:24-cv-3003 |
| *Plaintiff,* | |
| v. | Assigned to the Honorable Judge John F. Murphy |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, | |
| *Defendant.* | |

**PLAINTIFF'S FIRST AMENDED MEMORANDUM IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION**

i

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................... 1

STATEMENT OF FACTS........................................................................................................ 1

   **I.**    Defendant FINRA is a Self-Regulatory Organization Empowered by the SEC ................ 2

   **II.**   Defendant FINRA seeks to subject Plaintiff to its Unconstitutional Tribunal ................... 5

PROCEDURAL HISTORY ...................................................................................................... 6

ARGUMENT............................................................................................................................. 8

   **I.**    Plaintiff has a reasonable probability of prevailing on the merits. .................................... 8

    A.    Plaintiff is likely to prevail on his claim under the Seventh Amendment right to a jury trial before an Article III court. ............................................................................... 10

    B.    Plaintiff is likely to prevail on his claim that FINRA's hearing officers impermissibly wield executive power that only the President and officers under his direct supervision may exercise. ....................................................................................................................... 16

CONCLUSION ...................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.,* No. 23-5129, 2023 U.S. App. LEXIS 16987 (D.C. Cir., July 5, 2023) ……………………………………………………………2, 4, 9-11, 16-18

*Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 178, 143 S. Ct. 890, 897 (2023) ……………1, 10, 18

*Banca Cremi, S.A. v. Alex, Brown & Sons, Inc.*, 132 F.3d 1017……………………………...11-12

*Clark v. John Lamula Inv'rs, Inc.*, 583 F.2d 594 (2d Cir. 1978)………………………………….12

*Granfinanciera v. Nordberg*, 492 U.S. 33, 109 S. Ct. 2782 (1989) ……………...…………...10, 14

*Fiero v. Fin. Indus. Regulatory Auth., Inc.*, 660 F.3d 569 (2d Cir. 2011) ……………………14-15

*Jones v. Ohio Nat'l Life Ins. Co.*, No. 1:20-cv-654, 2022 U.S. Dist. LEXIS 69688 (S.D. Ohio Apr. 15, 2022)………………………………………………………………………………...11-12

*Loper Right Enters. V. Raimondo*, Nos. 22-451, 22-1219, 2024 U.S. LEXIS 2882 (June 28, 2024) …………………………………………………………………………………………..7

*Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 802, 139 S. Ct. 1921 (2019) ……..….17

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, F. Supp. 3d, 2023 U.S. Dist. LEXIS 77822 (N.D. Tex. May 4, 2023) …………………………………………………………………17

*Mohlman v. Fin. Indus. Regulatory Auth.*, No. 3:19-cv-154, 2020 U.S. Dist. LEXIS 31781 (S.D. Ohio Feb. 24, 2020)………………………………………………………………………………17

*McGinn, Smith & Co., Inc. v. FINRA*, 786 F. Supp. 2d 139 (D.D.C. 2011) ……………..………17

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 15 L. Ed. 372 …………………………………………………………………………………………………18

*O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893 (10th Cir. 1992)…………………………..12

*Parsons v. Bedford*, 28 U.S. (3 Peters) 433 (1830) …………………………………………………18

*Rhinehimer v. U.S. Bancorp Invs., Inc.*, No. 2011-136 (WOB-REW), 2013 U.S. Dist. LEXIS 190176 (E.D. Ky. May 8, 2013)…………………………………………………………………11

*Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840 (6th Cir. 2007) ………11-12

*Robertson v. Metlife Sec., Inc.*, 779 F. App'x 783 (2d Cir. 2019)……………………………12-13

*Stern v. Marshall*, 564 U. S. 462, 131 S. Ct. 2594 (2011) ……………………………………………18

*Tuberville v. FINRA*, 874 F.3d 1268 (11th Cir. 2017) ……………………………………………17

*Tull v. United States*, 481 U.S. 412, (1987) ………………………………………………10, 14-15

*United States SEC v. Appelbaum*, No. 22-81115-CIV-CAN, 2023 U.S. Dist. LEXIS 39201 (S.D. Fla. Jan. 24, 2023) ……………………………………………………………………………..13

*United States SEC v. Appelbaum*, No. 22-81115-CIV-CAN, 2023 U.S. Dist. LEXIS 203861 (S.D. Fla. Nov. 14, 2023)………………………………………………………………………………13

*United States Securities and Exchange Commission v. Jarkesy*, No. 22-859, 2024 U.S. LEXIS 2847 (June 27, 2024)……………………………………………….....................1, 3, 4, 8-11, 14-18

*United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449, 143 S. Ct. 1720, 1741 (2023)………………………………………………………………………………………...9

*INS* v. *Chadha*, 462 U. S. 919, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983) …………………………...18

**Statutes and Rules**

Securities Exchange Act of 1934 …………………………………………………1, 5-9, 11, 13, 15

Seventh Amendment ……………………………………………………………...........1, 8-10, 17-18

FINRA Rule 9120 ………………………………………………………………...…………2, 17

Article II Appointments Clause ………………………………………………...3, 9-10, 16-18

FINRA Rule 8210 …………………………………………………………………………..4, 17

FINRA Rule 2010 ………………………………………………………………..………6, 15

FINRA Rule 2111 ……………………………………………………….……...6, 13, 15

FINRA Rule 4511 ………………………………………………………………………….6

FINRA Rule 8310 ………………………………………………………………………14, 15

Freedom of Information Act …………………………………………………………..18

**Publications**

*Lewis D. Lowenfels & Alan R. Bromberg*, Suitability in Securities Transactions, 54 Bus. Law. 1557 (1999)………………………………………………………………………………………….12

# INTRODUCTION

Pursuant to the recent United States Supreme Court ruling in *United States Securities and Exchange Commission v. Jarkesy*, No. 22-859, 2024 U.S. LEXIS 2847 (June 27, 2024), Plaintiff D. Allen Blankenship ("Blankenship") respectfully requests this Honorable Court enjoin the Financial Industry Regulatory Authority ("FINRA") from proceeding with an administrative hearing which will violate Plaintiff's rights under the Seventh Amendment to the United States Constitution under the interpretation set forth in *Jarkesy*.

A self-regulatory organization ("SRO") empowered and supervised by the United States Securities and Exchange Commission ("SEC"), intends to adjudicate claims against Plaintiff through an in-house administrative arbitration panel, rather than before a federal court as required by the *Jarkesy* opinion. Only a preliminary injunctive order from this Court will prevent this imminent violation of Plaintiff's constitutional rights. See *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 178, 143 S. Ct. 890, 897 (2023) ("the resolution of claims by an unconstitutionally structured adjudicator is a 'here-and-now injury' that cannot later be remedied.")

# STATEMENT OF FACTS

Pursuant to the federal Securities Exchange Act of 1934, as amended (15 U.S.C. § 78a, et seq.) ("Exchange Act"), brokers and dealers of securities must be registered with the SEC. See 15 U.S.C. §78o(a). To purchase and sell securities, brokers and dealers must also become members of certain self-regulatory organizations ("SROs") established by the SEC, which SROs are primarily "responsible for 'enforc[ing] compliance' with the 'provisions' of the [Exchange Act], and the 'rules and regulations thereunder.' *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.,* No. 23-5129, 2023 U.S. App. LEXIS 16987, at *2 (D.C. Cir., July 5, 2023) (*citing* 15 U.S.C. §78s(g)(1)

1

and 15 U.S.C. §78o-3(b)(7)). Natural persons who represent brokers and dealers in the purchase and sales of securities must also be registered with all states in which such natural person conducts securities business, and such persons must be subject to the jurisdiction of the SRO to which their employing broker or dealer is a member.

## I.    DEFENDANT FINRA IS A SELF-REGULATORY ORGANIZATION EMPOWERED BY THE SEC

Defendant FINRA was created by the SEC on July 26, 2007,[1] through consolidation of its predecessor SRO, the National Association of Securities Dealers ("NASD"), and the regulatory arm of the New York Stock Exchange. As the District of Columbia Circuit Court of Appeals very recently noted in *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth., supra*, although FINRA is not technically a government agency, it is a private corporation empowered by the SEC with the "responsib[ility] for regulating securities brokers."[2] Specifically, FINRA maintains an investigative division, an enforcement division, and an adjudicative body that issues determinations on enforcement actions filed against member registrants. FINRA's adjudicative body is known as the Office of Hearing Officer ("OHO").  In short, FINRA investigates, prosecutes, and adjudicates claims against member brokers, dealers, and their associated employees.

FINRA gives the individual presiding over claims adjudicated in OHO proceedings the title, "Hearing Officer."[3] Every hearing officer is appointed by a "Chief Hearing Officer."[4] Unsurprisingly, the "Chief Hearing Officer" is *designated* by FINRA's Chief Executive Officer

---

[1] 15 U.S.C. § 78o-3 "Registered securities associations"
[2] *Alpine*, U.S. App. LEXIS 16987, at *2-5; 15 U.S.C § 78s(g)(1)
[3] FINRA Rule 9120(r).
[4] *Id.*

("CEO").[5] The CEO of FINRA is *not* appointed by the President under the Article II Appointments Clause, rather, he is *chosen* by the FINRA Board of Directors. When it comes to the individuals who comprise the FINRA Board of Directors, FINRA's Nominating Committee (also chosen *inter se* by FINRA) nominates 15 of the board members, and the remaining 7 members are voted on by FINRA member firms. In short, there are no FINRA officers or directors who were properly appointed, pursuant to the Article II Appointments Clause.

Pursuant to FINRA Rule 1015(a), a decision rendered in an OHO disciplinary proceeding may be appealed to FINRA's National Adjudicatory Counsel ("NAC"), within 25 days following service of the decision. The NAC performs a *de novo* review of each appealed decision and issues a written appellate decision that "may affirm, modify, or reverse" the OHO decision being reviewed.[6] Upon receipt of an NAC appellate decision containing an imposition of a disciplinary sanction, the individual subject to the sanction has a statutory right to motion for review "by [the] appropriate regulatory agency."[7] The appropriate regulatory agency that is statutorily obligated to review a "final disciplinary sanction" imposed by FINRA is the SEC.[8] That creates a distinct problem, with respect to the Supreme Court's holding in Jarkesy, because the Supreme Court established that common law fraud claims cannot be adjudicated by the SEC administrative courts. Accordingly, it is established that Defendant's claims against Mr. Blankenship, sounding in common law claims of fraud and misrepresentation, belong in an Article III court before a jury— whether in the OHO proceeding, or on appeal to the SEC.

---

[5] *Id.* (b).

[6] *Id.* (j)(1).

[7] 15 U.S.C. § 78s(d)

[8] The obligation requires that the aggrieved must file his motion seeking review under 15 U.S.C. § 78(s)(d) within thirty days after the date notice of the final regulatory action was issued. Id., at (2).

3

In recently imposing an injunction against FINRA's OHO adjudicative process, the United States Court of Appeals for the DC Circuit noted:

> *FINRA's hearing officers are near carbon copies of [SEC Administrative Law Judges "ALJs"]. They are tasked by statute with enforcing the nation's securities laws. 15 U.S.C § 78s(g)(1). They can "levy sanctions that carry the force of federal law."* Turbeville v. FINRA*, 874 F.3d 1268, 1270 (11th Cir. 2017) (citing 15 U.S.C. § 78o-3(b)(7)). And like* [the SEC's] *ALJs, hearing officers demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with discovery orders by punishing contempt.* See *FINRA Rules 8210 (Provision of Information and Testimony), 9252 (Requests for Information), 9235 (Hearing Officer Authority), 9263 (Evidence Admissibility), 9280 (Contemptuous Conduct).*
>
> *True, the SEC can review FINRA's decisions "on its own motion, or upon application by any person aggrieved . . . filed within thirty days." 15 U.S.C. § 78s(d)(2). But that doesn't differentiate the hearing officers from* [SEC] *ALJs. The SEC could review the ALJs' decisions too. Yet that "ma[d]e no difference" to whether they exercised significant executive power.* Lucia*, 138 S. Ct. at 2054. The Court emphasized that the SEC "adopts [ALJs'] credibility findings absent overwhelming evidence to the contrary."* Id. *(cleaned up). The standard of review is similar here.* See Daniel D. Manoff*, 55 S.E.C. 1155, n.6 (2002) (credibility determinations made by NASD—FINRA's predecessor—"can be overcome only when there is 'substantial evidence' for doing so") (cleaned up).*

*Alpine*, U.S. App., at \*6-7. Accordingly, the DC Circuit enjoined FINRA's OHO proceeding pending a determination on the merits as to whether FINRA had the authority to conduct the proceeding. It is important to note that the Alpine court enjoined FINRA's OHO one year prior to the Supreme Court's *Jarkesy* opinion.

It is this same OHO administrative procedure that FINRA seeks to resume against Plaintiff, in clear violation of the principle established in *Alpine* and the Supreme Court's recent opinion in *Jarkesy*.

II.    **DEFENDANT FINRA SEEKS TO SUBJECT PLAINTIFF TO ITS UNCONSTITUTIONAL TRIBUNAL**

Since February 1997, Plaintiff D. Allen Blankenship has been licensed as an associated person or registered representative of various broker-dealers registered with the SEC and a member of FINRA, as required by the Exchange Act.[9] On November 19, 2019, Plaintiff was notified by Defendant that an inquiry had been initiated against Plaintiff based upon information filed publicly by Independent Financial Group, LLC ("IFG"), Blankenship's former broker-dealer employer.[10] Therein, IFG characterized the reason for his termination as, *in haec verba*, "[ ] for violation of firm's policy with regard to submission of required documents for certain mutual fund transactions, failure to ensure clients were receiving [ ] benefit of mutual fund breakpoints[,] and exercising discretion without proper authorization." In subsequent litigation brought against IFG by Blankenship, it was determined that these public statements were false and defamatory, and Blankenship was awarded damages as a result.[11]

Nonetheless, for 37 months following receipt of the above-referenced notification from Defendant, Blankenship fully-complied with Defendant's formal and informal requests for information and documentation.[12] In addition, Blankenship incurred hundreds of thousands of dollars in costs for representation—during and after the 37-month period—exhausting his

---

[9] As used herein, "FINRA" also pertains to FINRA's predecessor, the National Association of Securities Dealers ("NASD").

[10] IFG filed a termination notice, known as a Form U5, which publicly discloses that a registered representative has been terminated by a registered broker-dealer.

[11] On December 6, 2021, a FINRA arbitration panel held that IFG's allegation that Blankenship exercised unauthorized use of discretion *was defamatory in nature*, and the Panel recommended expungement of the allegation.

[12] Defendant issued over 12 formal written requests for information and documentation during its investigation. Through counsel, Blankenship provided, *inter alia*, more than 12,000 pages of handwritten notes and documents annotated with handwritten notes requested by Defendant.

retirement and savings, entirely. As a result of Defendant's efforts to obtain evidence from Blankenship's customers in support of Defendant's allegations, Blankenship suffered substantial harm to his professional reputation which resulted in a 65% decline in his earnings.

## PROCEDURAL HISTORY

Nearly three years after opening an investigation into Plaintiff, on November 2, 2022, Defendant issued a Wells Notice to Plaintiff,[13] asserting that FINRA had "made a preliminary determination" to recommend disciplinary action against Plaintiff for violations of FINRA Rules: 2010, 2111, 3260(b), and 4511, as well as NASD Rule 2510(b).

Over one year later, on December 7, 2023, Defendant filed a formal disciplinary complaint (see *supra*, FINRA Disc. Proceeding No. 2019064333401, Dept. of Enforcement's Complaint, hereafter "Complaint") against Blankenship. In a departure from the Wells Notice, Defendant alleged violations of FINRA Rules 2010,[14] 2111,[15] and 4511[16] in its Complaint. Defendant's filing of the Complaint initiated its *in-house* OHO proceedings against Blankenship.

**FINRA RULEMAKING PROCESS**

The FINRA Rules with which Defendant charges Blankenship, and all other FINRA Rules, are created by FINRA through the authority granted to it—not by Congress, but rather, as a byproduct of Congress's 45-day ultimatum to the SEC. See 15 U.S.C. § 78s(b)(2)(A)(i) (mandating

---

[13] *Wells Notice* is a term borrowed from the SEC that refers to a letter sent by a regulator to a prospective respondent, notifying him of the substance of the charges that the regulator intends to bring against the prospective respondent.

[14] FINRA Rule 2010, Standards of Commercial Honor and Principles of Trade, is an add-on rule, whereby a violation of another rule constitutes a violation of Rule 2010.

[15] Rule 2111, Suitability, is the sole substantive charge against Blankenship. It comports with the anti-fraud provisions of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 (17 C.F.R. § 240.10b-5). Discussed *infra*.

[16] Rule 4511, General Requirements, is (also) an add-on rule, whereby Defendant seeks to hold the accused liable for inaccuracies in his firm's books and records, if the alleged misconduct caused such inaccuracies.

that the SEC either approve or disapprove of FINRA's proposed rule changes within 45 days).  All such proposed rule changes are submitted to the SEC, pursuant to 15 U.S.C. §78s(b)(1). Upon receipt by the SEC and "as soon as practicable after the date of filing of any proposed rule change, [the SEC] publish[es] notice [to] give interested persons an opportunity to submit written data, views, and arguments concerning such proposed rule change." *Id.* The period immediately following the SEC's publication of proposed rule change is commonly known as the "comment period." Absent the implication of an extension of time, to which the SEC must obtain FINRA's consent, under *id.*, (b)(2)(A)(ii), the SEC is compelled to either grant approval or deny the proposed rule contrived by FINRA.

Should the SEC wish to approve of a proposed rule change, the SEC is statutorily required to *interpret* the proposed rule change insofar as ensuring that it is "consistent with the requirements of [U.S. Code, Title 15, C]hapter [2B (i.e., the Exchange Act)] and the rules and regulations issued under [it] that are applicable to [FINRA]." *Id.*, (b)(2)(C)(i). To put another way, Congress mandates that the SEC, *interpret* the Exchange Act in every instance that FINRA submits a proposed rule change . . . and, "the rules and regulations [(i.e., provisions)] issued under [the Exchange Act, and determine which are] applicable to [FINRA—who, consequently, drafted the very same proposed rule being reviewed by the SEC to determine if said proposed rule comports with the SEC's interpretation of the Exchange Act]." *Id.*, See *Loper Right Enters. V. Raimondo*, Nos. 22-451, 22-1219, 2024 U.S. LEXIS 2882, at \*9-10 (June 28, 2024) (wherein, the Supreme Court is outwardly critical of agencies such as the SEC *interpreting* statutory ambiguities).

To reiterate, prior to approval, the SEC's *interpretation* of a proposed rule change requires the SEC to unilaterally determine whether the proposed rule change is "consistent with the *requirements* of the [Exchange Act]." 15 U.S.C. § 78s (b)(2)(C)(i) (*emphasis added*). Further, the

7

SEC must determine whether the proposed rule change "is consistent with the *rules and regulations* under [the Exchange Act]." *Id.* (*emphasis added*). But in doing so, the SEC must also unilaterally determine *which* "rules and regulations under [the Exchange Act] *apply to* [FINRA]." *Id.* (*emphasis added*). Upon the SEC completing the above-enumerated *interpretations* of the proposed rule change, its provisions, and which apply to FINRA, the SEC formally approves the proposed rule, which will take effect and be enforceable upon publication with the federal register. 15 U.S.C. §§ 78s(b)(2)(A-F), et seq.

It follows in logic that all FINRA Rules, including those with which Defendant charges Blankenship, are not only vetted and approved by the SEC—they are also deemed by the SEC to be "consistent with the requirements of [the Exchange Act and] the [provisions] under it that apply to [FINRA]." 78s(b)(2)(C)(i). Lastly, the SEC's involvement is a statutory requirement of implementing all FINRA Rules.

On January 4, 2024, through counsel, Blankenship timely filed his Statement of Answer to the Complaint. The OHO has appointed a Hearing Officer, and FINRA and the Hearing Officer have agreed to stay the hearing pending the outcome Plaintiff's motion for a preliminary injunction.

## ARGUMENT

### I.    PLAINTIFF HAS A REASONABLE PROBABILITY OF PREVAILING ON THE MERITS.

Plaintiff comes before the Court on the heels of the United States Supreme Court's (6-3) decision in *SEC v. Jarkesy*, No. 22-859, 2024 U.S. LEXIS 2847 (June 27, 2024). *Jarkesy* held: (1) "[s]uits at common law" (e.g., fraud and misrepresentation) are subject to the Seventh

Amendment;[17] and (2) Congress, in the Exchange Act, did not establish or define a "public right" for which Article II administrative courts could adjudicate "[s]uits at common law." (i.e., the SEC, may no longer pursue claims against individuals that are legal in nature through *in-house* enforcement proceedings). The Supreme Court reasoned that the Seventh Amendment is implicated in such instances, because such claims involve private rights,[18] by which the accused has a constitutional right to a jury trial.

Two weeks prior, the D.C. Circuit Court of Appeals ruled in favor of the Appellant, Alpine Securities Corp., by granting an emergency motion against FINRA to enjoin it from continuing its "enforcement action seeking to stop Alpine from selling securities." *Alpine*, U.S. App., at *2 (ordering that FINRA, the SRO, "be enjoined from continuing [its] enforcement proceedings against Alpine Securities Corporation." *Id.*). Judge Walker reasoned that "[t]here is a serious argument that FINRA hearing officers exercise significant executive power. And it is undisputed that they do not act under the President[— which] may be a constitutional problem." *Alpine*, U.S. App., at *10 (Citing U.S. const. art. II, § 1, cl. 1; *id.* art. II., § 2, cl. 2).

Less than one year prior, the Supreme Court's disdain for usurpers of executive power was clearly conveyed in the *Polansky* (8-1) decision, which stated that "the entire executive Power belongs to the President alone[, and] it can only be exercised by the President and those acting under him." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449, 143 S. Ct. 1720, 1741 (2023) (Thomas J., concurring) (cleaned up); see U.S. Const. art. II, § 1 ("The executive Power shall be vested in a President of the United States.").

---

[17] "If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory." *Jarkesy*, at *6.
[18] See FN19, *supra*.

Plaintiff seeks preliminary injunctive relief from this Court on two distinct legal grounds. Either of which, by itself, is sufficient grounds upon which to award Plaintiff the relief sought.

### A. Plaintiff is likely to prevail on his claim under the Seventh Amendment right to a jury trial before an Article III court.

First, Defendant's in-house prosecution of Blankenship is a violation of his Seventh Amendment right to a jury trial before an Article III court. On July 15, 2024, Defendant aims to resume an eight-day, *in-house prosecution*, presided over and prosecuted by Defendant. See *Jarkesy*, \*2-3, 11, 13; *Granfinanciera v. Nordberg*, 492 U.S. 33, 36, 109 S. Ct. 2782, 2787 (1989). If Blankenship's request for an injunction is *not* granted by the Court, he will be subject to "the resolution of claims by an unconstitutionally structured adjudicator[—which, *ipso facto*,] is a 'here-and-now injury' that cannot be later remedied." *Alpine*, U.S. App. \*3-4 (cleaned up) (citing *Axon*, 598 U.S., at 210).

Applying the analysis used by the Supreme Court in *Jarkesy*, as set forth in *Granfinanciera* and *Tull*,[19] it is clear that Defendant's in-house prosecution of Blankenship "may not be resolved outside of an Article III court, without a jury." *Jarkesy*, at \*3.

First, we apply part one of the two-part test set forth in *Granfinanciera* to "compare the statutory action to 18th-century actions brought in the courts of England, prior to the merger of the courts of law and equity." *Granfinanciera*, 492 U.S., at 42. The allegations brought by Defendant against Mr. Blankenship are that, "solely to earn commissions," Complaint, ¶ 1. Blankenship misrepresented or omitted material facts to his customers, and his customers relied upon the alleged misrepresentations and omissions to their detriment. *Id.*

---

[19] *Tull v. United States*, 481 U.S. 412, 417-418 (1987).

Although the charges levied against Blankenship by Defendant are artfully worded in to appear as though they are based upon a "novel statutory scheme[,]" in actuality, the allegations amount to nothing more than charges of common law fraud—and why wouldn't they? Just like the SEC was in *Jarkesy*, "[s]elf-regulatory organizations are responsible for 'enforc[ing] compliance' with the 'provisions' of the Securities and Exchange Act, and the 'rules and regulations thereunder.'" *Alpine*, App. Ct., at \*2 (citing 15 U.S.C. §§ 78o(a)(1), (b)(1)(B), 78s(g)(1); see also *id.* § 78o-3(b)(7)).

Courts have consistently held that "[a] suitability claim is a type of section 10(b) fraud claim." *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 848 (6th Cir. 2007) (citation omitted). Reasoning that, "[f]or a plaintiff to succeed on a Section 10(b) subset fraud "suitability" claim, he must prove five elements: (1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities; and (5) that the buyer justifiably relied to his detriment on the defendant's fraudulent conduct. (citing *Banca Cremi, S.A. v. Alex, Brown & Sons, Inc.*, 132 F.3d 1017, 1032 (4th Cir. 1997) (citations omitted) (internal quotation marks omitted); see *Rhinehimer v. U.S. Bancorp Invs., Inc.* 2013 U.S. Dist. LEXIS 190176, \*2-3.

In Jones v. Ohio Nat'l Life Ins. Co, U.S. Dist. LEXIS 69688 (S.D. Ohio Apr. 15, 2022), the Honorable Judge Cole held that, "[t]he Sixth Circuit has recognized (though only infrequently) a securities suitability claim as essentially a fraud claim.' *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 493 (6th Cir. 1990) [(brackets and internal quotation marks omitted)]; see also *Clemens Tr. V. Morgan Stanley DW, Inc.*, 485 dF.3d 840, 848 (6th Cir. 2007) ("A suitability claim is a type of section 10(b) fraud claim." (citing *Banca Cremi, S.A. v. Alex Brown & Sons, Inc.*, 485 F.3d 840,

11

848 (4th Cir. 1997))). Other circuits have likewise recognized such claims." See *Branca Cremi*, 132 F.3d at 1032 (citing "unsuitability" cases in the Tenth, Sixth, First, and Second Circuits)." *Jones*, 132 at \*7 (internal brackets and quotation marks omitted).

In *Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, (S.D. Ga. 2005) the Court held that, "[a] failure to make a suitability determination can constitute securities fraud under § 10(b). See, e.g., *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 599-600 (2d Cir. 1978); *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 896-97 (10th Cir. 1992) (discussing suitability violations in broker-investor context); see generally, *Lewis D. Lowenfels & Alan R. Bromberg*, Suitability in Securities Transactions, 54 Bus. Law. 1557 (1999). While liability for suitability violations, in the past, has been imposed on broker-dealers, premised on the so-called 'shingle theory,' those decisions are instructive in determining the propriety of imposing a similar duty on the part of the issuer in the context of variable annuity sales." *Cooper*, 229, at 252-253 (internal quotation marks omitted).

The Second Circuit Court of Appeals provided clarification in Robertson v. Metlife, in stating that:

> [t]his Court has recognized suitability claims—sometimes called "unsuitability claims"—as "a subset of the ordinary § 10(b) fraud claim." Brown v. E.F. Hutton Grp., 991 F.2d 1020, 1031 (2d Cir. 1993). In order to make out a suitability claim:
>
>> A plaintiff must prove (1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct.
>
> Id. at 1031. While there has been some confusion about what portion of Rule 10b-5 Robertson's claim implicates, as the claims she is bringing a 10b-5(a) or (c) claim for scheme liability while the MetLife Defendants cast her claim as one for 10b-5(b) misrepresentation liability, see U.S. Dist. LEXIS 54590, 2018 WL 1569385 at

12

> *\*3 (noting confusion among parties), this Court treats unsuitability claims as a subset of 10b-5(b) misstatement or omission claims. See Brown, 991 F.2d at 1031. In any event, in her brief before this Court, Robertson appears to admit that her claim, as she has cast it, falls within the misrepresentation or omission category of § 10(b) claims. See Pl.-App.'s Brief at 18.*

*Robertson v. Metlife Secs., Inc.*, 779 Fed. Appx. 783, 785-786 (2d Cir. 2019).

A recent case brought by the SEC against an individual, Appelbaum, in the U.S. Dist. Court for the Southern Dist. of Florida, for violations of FINRA Rule 2111,[20] clearly shows that the SEC views a violation of FINRA Rule 2111 as a "securities-fraud claim brought under Rule 10b-5[.]" *United States SEC v. Appelbaum*, No. 22-81115-CIV-CAN, 2023 U.S. Dist. LEXIS 39201 at *10 (S.D. Fla. Jan. 24, 2023) (Appelbaum's statements and omissions to customers, him being "well aware of his long-time customers' investment profiles[,]" and his "fail[ure] to follow [his employer's] policy[21]" was "sufficient . . . to create a strong inference that Appelbaum was aware that the [investments] were *unsuitable* for [his c]ustomers." *Appelbaum*, at *13-14) (*emphasis added*). Lastly, it is relevant to note that the *Appelbaum* matter, like many prosecutions by the SEC, was disposed of through a consent judgment that, in relevant part, mirrors current consent judgments for SEC allegations against violations of anti-fraud provisions. [22] In fact, there is no mention of FINRA Rule 2111 in the consent judgment. The SEC's complaint, alleging that Appelbaum violated FINRA Rule 2111, was ultimately disposed of through a consent judgment solely referring to the anti-fraud provisions of the Exchange Act.

---

[20] A violation of FINRA Rule 2111 is the same substantive violation with which FINRA charged Mr. Blankenship. See FN18, *supra*.

[21] The employer's policy that Appelbaum failed to follow involved "Appelbaum['s] further fail[ure] to obtain customer signatures." *Appelbaum*, at *16. *Compare*, Defendant's allegation against Mr. Blankenship that he "fail[ed] to obtain customers' signatures on the [employer-required] forms." Complaint, p. 2, at 2.

[22] *United States SEC v. Appelbaum*, No. 22-81115-CIV-CAN, 2023 U.S. Dist. LEXIS 203861 (S.D. Fla. Nov. 14, 2023).

The second part of the two-part *Granfinanciera* test relied upon in *Jarkesy* requires that the factfinder "examine the remedy sought and determine whether it is legal or equitable in nature." *Granfinanciera*, 492 U.S., 2790 (citing *Tull*, 481 U.S., at 417-418). In considering this part of the analysis, *Tull* provides applicable insight by noting that the statute authorizing the action in *Tull* "does not direct that the [monetary] penalty imposed be calculated solely on the basis of equitable determinations, such as the profits gained from violations of the statute, [among other things, and that] history of [the authorizing statute] reveals that Congress wanted the district court to consider the need for *retribution* and *deterrence*, in addition to restitution, when it imposed [monetary] penalties." *Tull*, 481 U.S. at 422 (*Emphasis added*).

The relief sought in Defendant's claims against Blankenship is, *inter alia*, that "the Panel order that *one or more of the sanctions* provided under FINRA Rule 8310(a) be imposed, including that [Blankenship] be required to *disgorge fully* any ill-gotten gains and/or make full and complete restitution, together with interest[.]" Complaint, p. 11, at B. (*Emphasis added*). See Complaint, pp. 1, 4 (identifying the amount of purportedly "unnecessary upfront sales charges" paid by the customers as $21,158.45); compare *Id.* p. 4 (indicating that Blankenship obtained $16,014.16 of the $21,158.45 amount paid). Notwithstanding the discussion *infra*, demonstrating that disgorgements by FINRA are undistinguishable from fines, for Blankenship to "make full and complete restitution[,]" would require him to repay $5,144.29 (or greater than 32%) more than the purportedly "ill-gotten gains" received by Blankenship. *Id.* et seq.

First and foremost, fines, disgorgements, and restitution ordered by FINRA are futile, unless ordered against a member who continues operating under Defendant's jurisdiction after the order is issued. See *Fiero v. Fin. Indus. Regulatory Auth., Inc.*, 660 F.3d 569, 579 (2d Cir. 2011) (holding that "there was no existing SEC rule or statute that authorized the NASD [or FINRA] to

initiate judicial proceedings to enforce the collection of its disciplinary fines.") In addition, fines and disgorgements are placed into accounts owned and administered solely by FINRA—such funds are not paid to the individuals who suffered injury. Annual Report, FINRA (2023), pp. 2, 31, 36.

Secondly, relief awarded pursuant to FINRA Rule 8310(a) allows a hearing officer to "impose one or more of the following sanctions [ ] for any neglect to comply with [ ] the FINRA Rules . . . (1) censure [ ] (2) impose a fine" as well as suspension of current membership, suspension of or bar to future membership with any member, expulsion, issuance of a cease and desist, or the imposition of "any other fitting sanction." *Id.* The preceding reveals that relief requested under Rule 8310(a) does not limit the hearing officer to exclusively award sanctions "to restore the status quo." *Tull*, 481 U.S., at 424. Put another way, "[Rule 8310(a)]'s concerns are by no means limited to restoration of the status quo." *Id.* See 15 U.S.C.S. §§ 78u-2(c), 80b-3(i)(3) (The Exchange Act and Investment Advisers Act conditioning monetary penalties upon six factors, "[o]f [which], several concern culpability, *deterrence*, and recidivism. Because they tie the availability of civil penalties to the perceived need to punish the defendant rather than to restore the victim, such considerations are *legal rather than equitable*." *Jarkesy*, at *1. (*Emphasis added*).); *compare* FINRA Sanction Guidelines, March 2024, "General Principle Applicable to All Sanction Considerations" p. 2, at 1 (emphasizing the importance of "*deterrence*" by "*design*[*ing*] sanctions that are meaningful and significant[.]") (*Emphasis added*); accord, *Jarkesy* aptly holds that "[w]hat determines whether a monetary remedy is legal is if it is *designed* to punish or *deter* the wrongdoer, or, on the other hand, solely to restore the status quo." *Jarkesy*, at *21. (*Emphasis added*) (internal quotations omitted). *See also* FINRA Sanction Guidelines, March 2024, "Suitability—Unsuitable Recommendations" p. 121 (referring to FINRA Rules 2111 and 2010, and recommending a

15

"[m]onetary [s]anction" for a violation of these Rules should be a "[f]ine of $2,500 to $40,0000[.]" Unequivocally showing that Defendant recommends that hearing officers assess a punitive monetary fine and order it be paid to Defendant, for violations consistent with those that Defendant charged against Blankenship.)

**B. Plaintiff is likely to prevail on his claim that FINRA's hearing officers impermissibly wield executive power that only the President and officers under his direct supervision may exercise.**

*Jarkesy* concerns the SEC, rather than FINRA. Despite *Jarkesy* finding that the SEC's administrative legal justices ("ALJs") may not conduct in-house prosecutions in which the SEC seeks to impose monetary penalties upon the accused, the SEC is better positioned than FINRA to defend against an Article II attack of the SEC's exercise of executive power. Because unlike any single individual within FINRA, the Director of the SEC qualifies as an officer under the Article II Appointments Clause[23].

It is settled that the SEC's hearing officers, ALJs, wield significant executive power. *Alpine*, App. Ct., at *5. Similarly, it is also no secret that FINRA's hearing officers are "carbon-copies" of the SEC's ALJs. *Id.* Although Judge Walker points out two insignificant differences between the SEC's ALJs and FINRA's hearing officers,[24] the difference that is most relevant in the immediate matter is that, unlike the SEC's ALJs, Defendant's hearing officers can show no linage to anyone appropriately appointed by the Article II Appointments Clause.

---

[23] President Joe R. Biden nominated the current Chair of the SEC on February 3, 2021. The appointment was confirmed by the U.S. Senate on April 14, 2021, and SEC Chairperson, Gary Gensler, was sworn into office on April 17, 2021.

[24] *Alpine*, FN1 "To be sure, there are some minor differences between the FINRA hearing officers and [the SEC]'s ALJs. For example, the ALJs administer Oaths. In FINRA hearings, that job is left to a court reporter or notary public." (internal quotations and citations omitted).

16

FINRA's hearing officers undeniably wield substantial executive power through fulfilling their statutory task of "enforcing the nation's securities laws." *Id.* In addition, "[t]hey can levy sanctions that carry the force of federal law[,] demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with discovery orders by punishing contempt." *Id.* See *Tuberville v. FINRA*, 874 F.3d 1268, 1270 (11th Cir. 2017); See also FINRA Rules 8210 (Provision of Information and Testimony), 9120 (Definitions), 9252 (Requests for Information), 9235 (Hearing Officer Authority), 9263 (Evidence Admissibility), 9280 (Contemptuous Conduct).

The courts' growing disdain for usurpers of executive power makes the proceedings initiated by Defendant against Blankenship uniquely problematic, because as noted in *Alpine*, "[a]nyone who wields significant executive power must be an Officer of the United States." *Id.*, at *5. As discussed *supra*, none at FINRA constitute an officer under Article II. Further, notwithstanding the Supreme Court holding that "[a] private entity may qualify as a state actor when . . . the entity exercises powers traditionally exclusively reserved to the State" (*Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 802, 139 S. Ct. 1921, 1924 (2019)), Defendant has historically prevailed in its argument that it is not a state actor. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, F. Supp. 3d, 2023 U.S. Dist. LEXIS 77822, at *14 (N.D. Tex. May 4, 2023); *Mohlman v. Fin. Indus. Regulatory Auth.*, No. 3:19-cv-154, 2020 U.S. Dist. LEXIS 31781, at *14 (S.D. Ohio Feb. 24, 2020); *McGinn, Smith & Co., Inc. v. FINRA*, 786 F. Supp. 2d 139, 147 (D.D.C. 2011).

All the same, the tide has clearly changed for Defendant in a post-Jarkesy world. Because if, or when, FINRA is deemed a state actor, Defendant will be relieved of the rationale that, as a private company, it need not adhere to the Seventh Amendment. Further it will likely also be

subject to Freedom of Information Act ("FOIA") requests and a level of transparency previously to Defendant.

## II.    PLAINTIFF WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION.

Blankenship will "suffer irreparable harm without an injunction[,] because the ongoing FINRA enforcement proceedings will put [him] out of business. Plus, the resolution of claims by an unconstitutionally structured adjudicator is a 'here-and-now-injury' that cannot be later remedied." *Alpine*, U.S. App., at \*3-4 (citing *Axon Enterprises*, *supra*).

## III.    THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION.

Undoubtedly, the public has a longstanding interest in expedient and efficient enforcement against those who break the law. Oftentimes at the expense of efficiency and expediency, the Constitution prevents Congress from "withdraw[ing] from judicial cognizance any matter which, from its very nature, is the subject of a suit at the common law." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 284, 15 L. Ed. 372. A jury trial by an Article III court is required for "all suits which are not of equity or admiralty jurisdiction, whatever may be the particular form which they may assume." *Parsons v. Bedford*, 28 U.S. (3 Peters) 433, 441 (1830). Further, precedent forecloses the argument that statutes aimed at increasing governmental efficiency trigger the public-rights exception to the Seventh Amendment. See *Stern v. Marshall*, 564 U. S. 462, 501, 131 S. Ct. 2594 (2011); *INS* v. *Chadha*, 462 U. S. 919, 944, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983) (quoting Justice White's dissent). If the public rights exception were allowed to be applied to Defendant, "evading the Seventh Amendment would become nothing more than a game, where the Government need only identify some slight advantage to the public from agency adjudication to strip its target of the protections of the Seventh Amendment." *Jarkesy*, at \*43.

Of substantial relevance in the immediate matter is the fact that "the only evidence that [Blankenship] *has* violated the law is [Defendant]'s say-so. And if [Blankenship] is correct on the merits, then FINRA is an illegitimate decisionmaker." *Alpine*, U.S. App., at *4 (*emphasis original*). Borrowing from Judge Walker, Plaintiff asserts that "an injunction would also be equitable and in the public interest[, because] the public interest favors preventing the deprivation of individual rights and abuses of government power. If [Blankenship]'s constitutional challenge has merit, that is the case here: [he] will be 'subject[] to an illegitimate proceeding, led by an illegitimate decisionmaker.'" (Internal citations omitted). *Id*.

## CONCLUSION

For all the reasons set forth herein, Plaintiff's motion for a preliminary injunction should be GRANTED.

Respectfully submitted this 15th day of July, 2024.

By: */s/ John P. Quinn*

John P. Quinn, Esq. (Pa. Bar No. 85239)
Quinn Law Partners, LLC
Radnor Financial Center
150 N. Radnor Chester Road, Suite F200
Radnor, PA 19087
Telephone: (484) 354-8080
Email: jpquinn@quinnlp.com

Dochtor D. Kennedy, MBA, J.D. (Co. Bar No. 45851)
*Admitted on Pro Hac Vice Motion*
HLBS Law
390 Interlocken Crescent, Suite 350
Broomfield, CO 80021
Telephone: (720) 282-5154
Facsimile: (720) 340-5022
Email: doc.kennedy@hlbslaw.com

19